SERVICE EMPLOYEES INTERNA-
TIONAL UNION, LOCAL
82, Plaintiff,

v.

DISTRICT OF COLUMBIA
GOVERNMENT, et al.,
Defendants.

Civ. A. No. 85–1031.

United States District Court,
District of Columbia.

May 10, 1985.

J. Lincoln Woodard, Washington, D.C., for plaintiff.

Robert J. Harlan, Chief, Litigation Section, Community Development Div., Office of the Corporation Counsel, Washington, D.C., for defendants.

Michael R. McAdoo, King and Nordlinger, Washington, D.C., amicus curiae, for Apartment and Office Building Ass'n.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court on cross-motions for summary judgment on plaintiff's challenge to the constitutionality of certain regulations enacted by defendants to restrict the operations of street vendors in the District of Columbia. A motion for leave to file a brief *amicus curiae* in support of defendants has also been filed by four business groups.[1] Plaintiff, a labor union which represents approximately 5,000 workers, including sidewalk vendors, in Washington, D.C., challenges the regulations on the grounds that they impose an unconstitutional burden on interstate commerce in violation of the commerce clause of the United States Constitution, and deprive members of their rights to equal protection and due process secured by the fifth and fourteenth amendments to the Constitution. The regulations are scheduled to go into effect on May 14, 1985.

### I. *Background*

Plaintiff challenges ten regulations. They are: 24 D.C.M.R. § 502.11, which bars operation in a zone not designated on the vendor's license; § 508.1, which mandates that records of sales and receipts of purchases and expenses be made available for inspection by "any authorized representative of the District of Columbia Government"; § 508.3, which penalizes failure to make such records available by allowing "immediate seizure, without notice, of the vendor's license"; §§ 510.3 and 510.4, which restrict sidewalk vending to sidewalks which are at least eighteen feet wide and provide criteria for measuring sidewalks; § 511.1, which bars operation before 5 a.m. and after 10 p.m. Sunday through Thursday or after 1 a.m. on Saturday and Sunday mornings, and which also bans overnight storage of equipment or merchandise; § 512.2, which requires compliance with design standards for sidewalk carts; § 515.18(g), which restricts the types of merchandise which may be sold by street vendors; and §§ 524.1 and 524.2, which require payment of a bond in the amount of $500 for D.C. residents and $1,500 for nonresidents.[2]

Plaintiff's commerce clause challenge is directed to six of the regulations: §§ 502.-11, 511.1, 512.2, 515.18(g), 524.1, and 524.2. Sections 508.1, 510.3, and 510.4 are challenged as vague and ambiguous in violation of the due process clause. Plaintiff contends that §§ 502.11, 511.1, 512.2, 515.-18(g), 524.1, and 524.2 deprive its members of equal protection and due process of law. Finally, plaintiff argues that § 508.3 deprives its members of due process by allowing seizure of licenses without a pretermination hearing.

### II. *Discussion*

#### A. Commerce Clause

##### 1. *Sections 502.11, 511.1, 512.2, and 515.18(g)*

Plaintiff argues that the regulations barring operation outside the zone designated

---

**1.** Business groups whose views are represented in the *amicus* brief are the Apartment and Office Building Association of Metropolitan Washington, Inc., the Connecticut Avenue Association, the Capitol Hill Association of Merchants and Professionals, and the Business and Professional Association of Georgetown.

**2.** Plaintiff also raised challenges to the constitutionality of sections 503.5, 503.6, 515.18(c) through (f), 524.3, 524.6, and 524.7 for the first time in its opposition to the motion for leave to file brief *amicus curiae*. *See* Plaintiff's Memorandum in Opposition to Motion for Leave to File Brief *Amicus Curiae* at 9 [hereinafter cited as Opposition to *Amicus* ]. None of those sections are mentioned in plaintiff's complaint or its motion for summary judgment, and plaintiff conceded at oral argument that the constitutionality of those regulations is not properly at issue in this case.

on the vendor's license (§ 502.11), restricting hours of operation and overnight storage (§ 511.1), requiring compliance with design standards (§ 512.2), and limiting the types of merchandise street vendors may sell (§ 515.18(g)) violate the commerce clause because they inhibit the ability of street vendors to generate income, stifle competition between street vendors and "storefront vendors," and discourage free trade among the states by reducing the amount of merchandise purchased by plaintiff's members for resale in the District of Columbia. It appears, however, that plaintiff has misconstrued the role of the commerce clause in constitutional adjudication and ignored a number of long-standing precedents.

■ First, plaintiff has made no showing whatever of the burden, if any, imposed by these regulations on interstate commerce. Cases in which local regulations or state laws have been struck down as violative of the commerce clause typically involve protectionist measures designed to insulate local industries against competition from outside the state, or discriminate against out-of-state dealers by, for example, refusing to license them for in-state operations. *See, e.g., Breard v. City of Alexandria, La.,* 341 U.S. 622, 636–37, 71 S.Ct. 920, 929–30, 95 L.Ed. 1233 (1951); *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354–55, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951); *Hood & Sons v. DuMond,* 336 U.S. 525, 537–40, 69 S.Ct. 657, 664–66, 93 L.Ed. 865 (1949); *Electrolert Corp. v. Barry,* 737 F.2d 110, 112–13 (D.C. Cir.1984). Here, in contrast, plaintiff has made no showing that these regulations will have any effect on out-of-state vendors different in any way from the effect on

local vendors. "[R]egulation that leaves out-of-state sellers on the same basis as local sellers cannot be invalid" so long as interstate commerce is neither prohibited nor discriminated against. *See Breard,* 341 U.S. at 638, 71 S.Ct. at 930; *see also Electrolert Corp.,* 737 F.2d at 113 (ban on sale or possession of radar detectors held not to violate commerce clause because neither overtly protectionist nor favoring instate commerce); *Commonwealth v. Gulden,* 369 Mass. 965, 341 N.E.2d 262, 263 (1976) (city ordinance barring sales by "hawkers or peddlers" of any goods or merchandise within 500 feet of any city playground between 9 a.m. and 9 p.m. to protect children in or near city playgrounds did not violate commerce clause).[3]

■ Even if plaintiff could show that nonresident vendors bore the brunt of the burden of these regulations, plaintiff's challenge would have to be rejected. *Breard* is almost directly on point. There, the Supreme Court upheld a city ordinance banning door-to-door solicitation against a challenge by a representative of an out-of-state corporation which was in the business of going from city to city soliciting magazine subscriptions. 341 U.S. at 624, 71 S.Ct. at 923. Despite the effect on interstate solicitors like plaintiff, the Court rejected the challenge, holding that "the usual methods of seeking business are left open by the ordinance. That such methods do not produce as much business as house-to-house canvassing is, constitutionally, immaterial and a matter for adjustment at the local level in the absence of federal legislation." 341 U.S. at 638, 71 S.Ct. at 930.

With the exception of section 524, which sets the amount of bond, these regulations,

---

**3.** Plaintiff has also characterized the merchandise restrictions in section 515.18(g) as imposing a restriction on interstate commerce by limiting the "free flow of ... non-permitted goods in interstate commerce." Opposition to *Amicus* at 2. This challenge must fail for two reasons. First, it appears that plaintiff lacks standing to challenge these regulations on behalf of *manufacturers* of non-permitted merchandise, since it is nowhere alleged that any of plaintiff's members are manufacturers as well as vendors. But

more importantly, it is obvious that the regulation provides no benefit to any *in-state* manufacturer. *No* street vendor may sell the non-permitted goods, irrespective of their source. Manufacturers of prohibited goods are still free to sell their goods to shopkeepers. The fact that overall sales of certain items in the District may be reduced by prohibiting their sale by street vendors is, as a matter of constitutional law, immaterial. *See Breard,* 341 U.S. at 638, 71 S.Ct. at 930.

on their face, are obviously not overtly protectionist of any in-state group *vis a vis* any out-of-state group. Plaintiff has made no showing whatever that these regulations will fall more heavily on nonresident street vendors than resident vendors, and has submitted no evidence that any discriminatory intent underlies the regulations in this regard. To the extent that they are protectionist of store front vendors *vis a vis street* vendors, however, the commerce clause is simply irrelevant to plaintiff's challenge. *See Electrolert Corp.*, 737 F.2d at 113.

### 2. *Sections 524.1 and 524.2*

Plaintiff's commerce clause challenge to the bonding requirements under sections 524.1 and 524.2 is, however, more substantial. Under section 524, nonresident vendors are required to post a bond $1,000 higher than the $500 bond required of resident vendors. Defendants contended in their briefs and at oral argument that the sole purpose of the bond requirement is to ensure the payment of sales taxes by street vendors. The distinction between the bond paid by resident and nonresident vendors, they contend, is justified by the District's inability to distrain the goods of nonresident vendors in the event that they fail to pay or underpay the sales taxes on merchandise they sell in the District, and thus is justified *solely* as a means of ensuring collection and payment of the District's sales taxes. Although *amici* point out that the distinction between resident and nonresident vendors disappears for any vendor who establishes a "track record" of dependability under §§ 524.6 and 524.8, counsel for defendant stated at oral argument that under section 524.8 it would take a minimum of five years to establish such a "track record." In addition, the initial requirement of posting the extra $1,000 bond could well prevent many nonresident street vendors from ever obtaining a license in the first instance, precluding them from ever establishing such a "track record."

Plaintiff has cited one case in which a bond required only of nonresident solicitors was struck down as violative of the commerce clause. In *Moyant v. Borough of Paramus*, 30 N.J. 528, 154 A.2d 9 (N.J. 1959), the New Jersey Supreme Court struck down a city ordinance which required a $1,000 bond "to be furnished only by non-residents of the borough or residents representing a firm whose principal place of business is located outside the State." 154 A.2d at 14. Although the court conceded that the bond was "obviously designed to assure a source of financial redress to the purchaser in case of fraud" by a nonresident solicitor, it concluded that

> the sum fixed bears no rational relation to the amount of business done, and is required of every single solicitor, even where, as here, several are employed by the same company.... [T]he bond requirement ... is unduly oppressive and so unreasonable as to the local police power.... Furthermore, the provision exempts borough residents unless they represent a firm whose principal place of business is outside the state. Extension of the requirement to residents soliciting for out-of-state businesses points to discrimination against those engaged in business across state lines.

154 A.2d at 20. The court further noted that the "cumulative effect" that such ordinances would have on nonresident solicitors in the event that they were enacted by many New Jersey communities provided an "added reason" to hold the provisions unconstitutional. 154 A.2d at 21.

There is the possibility, of course, that *Moyant* could be distinguished from the case at bar on several grounds. First, a bond of $1,500 *may* bear some relation to the amount of business done by a street vendor over a given period. Vendors who are District residents might be allowed to put up a smaller bond based on the city's determination that the remedies available to it against residents for nonpayment of sales taxes render a bond of greater than $500 unnecessary. Additionally, because street vendors probably do not operate in more than one jurisdiction like magazine solicitors are likely to do, there is arguably

little danger of any "cumulative effect" of such a bond requirement.

■■■ The District has not, however, either attempted to distinguish *Moyant* or, more importantly, offered any evidence that the treble bond for nonresidents is justified for purposes of sales tax collection. Although the city may need to establish only a "rational relation" between a higher bond and the District's problems with enforcing the sales tax requirements against nonresident vendors to survive an equal protection challenge to section 524, it is equally well-established that an ordinance which discriminates on its face on the basis of residency must more nearly "fit" the purposes for which it was enacted when challenged as a violation of the commerce clause or the privileges and immunities clause of article IV,[4] particularly when the challenged regulation interferes with the nonresident's livelihood. *See, e.g., Hicklin v. Orbeck,* 437 U.S. 518, 524, 98 S.Ct. 2482, 2487, 57 L.Ed.2d 397 (1978); *Baldwin v. Fish & Game Commission of Montana,* 436 U.S. 371, 383, 387, 98 S.Ct. 1852, 1860, 1862, 56 L.Ed.2d 354 (1978); *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). When a local regulation overtly discriminates against an out-of-state business interest, the burden falls on the state to justify the discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *See Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *Dean Milk v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951). Although neither the commerce clause nor the privileges and immunities clause precludes disparity of treatment when there are valid, independent reasons for it, *see, e.g., Toomer,* 334

U.S. at 396, 68 S.Ct. 1162, the Constitution mandates that the court examine closely statutes or regulations which practice overt discrimination against citizens of other states. The "fit" required of such provisions must be measured both in terms of their under- or over-inclusiveness and by the presence or absence of any nondiscriminatory alternatives open to the District. *See Hunt, supra.*

■■ In this case, the court holds that defendants have failed to carry their burden of justifying section 524's discrimination against nonresident vendors. This conclusion is unavoidable for several reasons. First, defendants have submitted no evidence whatsoever of the relation of the size of the bond to the amount at stake in the event that a nonresident vendor fails to pay the sales taxes due the District. At a sales tax rate of six percent, a vendor would have to sell $25,000 worth of goods before he would generate $1,500 in sales taxes. Assuming that, as plaintiff submits, sidewalk vendors are required to file a monthly sales tax return and to pay sales taxes on a monthly basis, it seems unlikely that very many vendors—if any—would generate sales sufficient to collect $1,500 in sales taxes without the District becoming aware of their noncompliance with the District's tax laws.

But more importantly, it appears that the District's interest in sales tax collection is already more than adequately protected by another provision of the new regulations. Under § 503.5, nonresident vendors may not obtain a certificate of registration, which is required before an applicant may obtain a vendor's license under § 503.4, until they have filed a bond "in an amount not exceeding double the amount of the applicant's estimated annual sales and use tax liability for a period not exceeding one

---

**4.** Although plaintiff did not raise a privileges and immunities clause challenge to the regulations, the "mutually reinforcing relationship between the Privileges and Immunities Clause of Article IV, § 2, and the Commerce Clause" renders a number of cases decided under the privileges and immunities clause relevant to plaintiff's commerce clause challenge. *See Hicklin v. Orbeck,* 437 U.S. 518, 531–33, 98 S.Ct. 2482, 2490–91, 57 L.Ed.2d 397 (1978).

(1) year." [5] Counsel for defendants conceded at oral argument that nonresident vendors would be subject to both the "double annual sales tax" bond required under § 503.5, *and* the treble bond required under § 524.2(b). Assuming that a typical vendor generates $1,500 in sales taxes per year (an amount which could arguably justify the $1,500 bond required of nonresidents under § 524), a nonresident vendor could be required to file a bond of up to $4,500 per year under sections 503.6 and 524, compared to a bond of no more than $600 required of District residents under those same regulations.[6]

The inability of the District to relate the amount of the bond to the amount of sales tax "at risk," as well as the disparity between resident and nonresident vendors, compels a holding that the challenged provision—section 524.2(b)—violates the commerce clause. While some distinction in the bonds required of resident and nonresident vendors might well be justified, a generalized interest in tax collection alone cannot justify so unreasonable a burden upon nonresidents, at least without evidence of record that the burden bears some proximate relation to the taxes at stake. As the Court held in *Toomer*,

> [T]he importance of having commerce between the [fifty] States flow unimpeded by local barriers persuades us that State restrictions inimical to the commerce clause should not be approved simply because they facilitate in some measure enforcement of a valid tax.

**5.** D.C. residents are subject to § 503.5, but, under § 503.6, may not be required to prepay more than $100.

**6.** As the estimated amount of annual sales tax rises, the disparity between nonresident and resident vendors increases dramatically. For example, a nonresident vendor who generates $5,000 per year in sales taxes could be required to post bonds of up to $11,500, ($10,000 under the "double annual sales tax" provision of § 503.5 and $1,500 under § 524.2(b) ) compared to the bonds of no more than $600 required of a resident vendor (no more than $100 under §§ 503.5 and 503.6 and $500 under § 524.2(a) ).

**7.** The initial problem with plaintiff's challenge is that the fourteenth amendment, under which plaintiff brings its equal protection claims, is

334 U.S. at 406, 68 S.Ct. at 1167. As in *Toomer*, the court

> would be closing [its] eyes to reality . . . if [it] concluded that there was a reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them.

334 U.S. at 399, 68 S.Ct. at 1163–64.

### B. Equal Protection and Due Process

#### 1. *Sections 502.11, 511.1, and 512.2*

As with most of plaintiff's challenges under the commerce clause, the bulk of its equal protection and due process challenges suffer from either a doctrinal misunderstanding of the nature of the constitutional claims or an overwhelming weight of contrary precedent.[7] As a preliminary matter, it does not appear that street vendors and store front vendors are "similarly situated" for purposes of equal protection analysis. For example, plaintiff challenges § 502.11, which bars vendors from operating outside the zone designated on their licenses, as a violation of equal protection on the ground that it restricts street vendors but not store front vendors. As a practical matter, it is obvious that street vendors and shopkeepers cannot be deemed "similarly situated" for purposes of this regulation, since store front vendors lack the mobility enjoyed by street vendors, and thus could not move freely from zone to zone—or even from door-to-door—even

not applicable to a suit against the District of Columbia. *E.g., Bulluck v. Washington,* 468 F.2d 1096, 1100 n. 9 (D.C.Cir.1972). Concepts of equal protection are, however, "inherent" in the fifth amendment's guarantee of due process of law, which is applicable to the District. *Id.; Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Although the phrases "equal protection" and "due process" are not always interchangeable, *Bolling, supra,* the court assumes for present purposes that to the extent that the challenged regulations would be barred by the equal protection clause if enacted by a state, they would also be violative of the due process clause of the fifth amendment in the context of litigation against the District of Columbia. *See Bulluck, supra.*

if they considered such moves advantageous. But more importantly, plaintiff has failed to demonstrate that the regulations' discrimination between street vendors and store front vendors involves either a suspect classification [8] or a fundamental right.[9] Absent invidious discrimination between groups based upon a suspect classification, such as race or religion, or involving a fundamental right, such as the right to vote or freedom of speech, the Supreme Court has made it clear that this court *must* uphold a statute challenged under equal protection or due process so long as the challenged classification bears some "rational relationship" to a legitimate state end. *See, e.g., City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *McDonald v. Board of Elections*, 394 U.S. 802, 808–09, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *Nebbia v. People of State of New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510–11, 78 L.Ed. 940 (1934); *see also Stone v. District of Columbia*, 572 F.Supp. 976, 981 (D.D.C.1983). The challenged regulations may thus be set aside as violative of plaintiff's members' rights to equal protection only if the separation of merchants into two classes—street vendors and store front vendors—is based on reasons totally unrelated to pursuit of the goals of the regulations. *See McDonald, id.; Stone, id.*

The court must give considerable deference to the legislature in determining the closeness of the "link" between the challenged regulations and their stated purposes. *See Globe Fur Dyeing Corp., v. United States*, 467 F.Supp 177 (D.D.C. 1978), *aff'd*, 612 F.2d 586 (1980). As the Supreme Court stated in *McDonald*,

> Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them.

394 U.S. at 809, 89 S.Ct. at 1408; *see also Globe Fur Dyeing Corp., supra.* Therefore, even if the source materials supplied by defendants do not state the precise reasons for the challenged regulations, plaintiff's equal protection challenge can be successful only if the court is unable to postulate any conceivable rationale for the regulations.

Defendants and *amici* have themselves proffered a variety of justifications for the regulations. Restrictions on areas of operation (§ 502.11), hours of operation and overnight storage (§ 511.1), and permissible designs (§ 512.2) are intended to guarantee public access to sidewalks by reducing congestion (Defendants' Exhibit J at 1, 9), curb

---

**8.** Almost as an afterthought, plaintiff has made a bald assertion that "an overwhelming majority of sidewalk vendors are minorities and women." Opposition to *Amicus* at 8. Even assuming that this contention is true—and plaintiff has cited no evidence in support of its assertion—it is insufficient to justify the conclusion that the vending regulations are based on a suspect classification. First, the vending regulations apply to *all* street vendors, not just blacks or women. Second, the Supreme Court made it clear in *Washington v. Davis* that a racially disproportionate impact alone, without some other evidence of invidious discrimination, is insufficient to trigger the rule that racial classifications are to be subjected to the strictest scrutiny. 426 U.S. 229, 239, 242, 96 S.Ct. 2040, 2047, 2049, 48 L.Ed.2d 597 (1976). Plaintiff has submitted no evidence that the challenged regulations are racially motivated, nor does that appear to be its contention. Rather, plaintiff appears to contend that because blacks and females are disproportionately burdened by the new regulations, they violate vendors' rights to equal protection. Such a contention is precluded by *Washington v. Davis, supra.*

**9.** Clearly, the District has the authority to impose a complete ban on all vending on public property. Since street vendors enjoy no constitutional right to pursue their calling on the city's streets and sidewalks, the court must reject any argument that the various restrictions imposed by the challenged regulations interfere with any substantive due process rights guaranteed by the fifth amendment. *See Stone v. District of Columbia*, 572 F.Supp. 976, 981 (D.D.C. 1983). Whether the city's authority to seize a vendor's license without a prior hearing under section 508.3 violates *procedural* due process rights is discussed *infra.*

excess and late-night noise (Defendants' Exhibits F, J at 18), enhance police enforcement efforts (Defendants' Exhibit F), create an aesthetically pleasing and "visually interesting" environment that "attracts people and stimulates redevelopment and commerce" (Defendants' Exhibit I, 31 D.C.R. 1114), and enhance street vendors' ability to make a profitable living by reducing competition among them (Defendants' Exhibit J at 10). The locational restrictions are also designed to guarantee better access to bus stops, loading and entrance zones, fire hydrants, parking meters, mail boxes, service and ventilation grates, and benches, as well as to reduce accumulation of litter that results from a high density of vendors on a given block. Defendants' Exhibit J at 12–13, 18. The ban on overnight storage is designed to eliminate "unsightly and dangerous" street vending equipment from the city's sidewalks. Defendants' Exhibit J at 18. Design standards are imposed to meet the objective that carts be weather resistant, safe, structurally sound, and aesthetically pleasing. Brooks Affidavit at 2, Defendants' Exhibit J at 20–22.

For the most part, the challenged regulations clearly bear a rational relation to the legitimate goals for which they were enacted. Locational restrictions will undoubtedly lead to less congestion on the city's sidewalks. Overnight storage poses a clear threat to pedestrian safety. Design restrictions, it may be believed, will lead to a more attractive "streetscape," as defendants put it. Further, the city's classification of merchants into shopkeepers and street vendors undoubtedly bears a close enough relation to the evils which the city purportedly seeks to avoid to withstand equal protection analysis. As the Supreme Court stated in *Williamson v. Lee Optical of Oklahoma,*

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the

problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.

348 U.S. at 489, 75 S.Ct. at 465 (citations omitted). Although the regulations may "exact a needless, wasteful requirement in many cases, ... it is for the legislature, not the courts to balance the advantages and disadvantages." *Id.* at 487, 75 S.Ct. at 464. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 487–88, 75 S.Ct. at 464.

There is also considerable precedential support for the validity of these regulations. In *Dukes v. City of New Orleans,* 501 F.2d 706 (5th Cir.1974), *rev'd on other grounds,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the court noted that "[T]he City Fathers might constitutionally enact any of a broad range of measures— for example, strict regulation of the *location* and *appearance* of pushcarts—in order to satisfy" the city's concerns regarding congestion and aesthetics. 501 F.2d at 713 (emphasis added). Time and location restrictions withstood an equal protection challenge in *Commonwealth v. Gulden,* 369 Mass. 965, 341 N.E.2d 262, 263 (1976), and an outright ban on street vending in "congested areas" was upheld in this jurisdiction in 1926 in *Carranzo v. District of Columbia,* 10 F.2d 983, 983 (D.C.Cir.1926). *See also John v. State,* 577 S.W.2d 483, 485 (Tex.Crim.App.1979) (city ordinance prohibiting sale of goods on city-owned property held to be a permissible way to regulate disruptions to pedestrian traffic flow); *Slater v. Salt Lake City,* 115 Utah 476, 206 P.2d 153, 155–56, 159–63 (1949) (ordinance barring sales of certain items upheld as not violative of equal protection).

Plaintiff declined to discuss any of these cases, either in its pleadings or at oral argument, on the ground that the cited cases originated from "other jurisdictions." Plaintiff also contends that a case from this jurisdiction, *Crane v. District of Columbia,* 289 F. 557 (D.D.C.1923), compels

the conclusion that these regulations are beyond the authority of the City Council. Aside from the obvious relevance of the cases cited by defendants and *amici* to the issues presently confronting the court, *Crane* is of doubtful relevance to the case at bar. First of all, *Crane* 's holding that the D.C. Commissioners lacked the authority to prohibit street sales by vendors was based entirely on a construction of the third paragraph of an Act of January 26, 1887, which has no bearing whatever on this case. Further, to the extent that *Crane* held that the police powers enjoyed by the Commissioners in 1923 were narrower than the police powers of a state legislature, plaintiff has cited no authority for the proposition that the District's police power authority is still so limited since the advent of Home Rule. Finally, to the extent that *Crane* is relevant to the constitutional limitations on regulation of street vendors, the case actually contradicts plaintiff's position that an absolute ban would violate the Constitution, since the court expressly held that Congress "could have authorized the commissioners to forbid all sales on the public streets ... or to limit such sales to licensed vendors." 289 F. at 560–61.

The one case cited by plaintiff in which a regulation restricting hours of operation was struck down as violative of due process is easily distinguishable from this case. In *Fasino v. Mayor and Members of the Borough Council of the Borough of Montvale*, 122 N.J.Super. 304, 300 A.2d 195 (N.J.Super.Ct.Law Div.), *aff'd*, 129 N.J.Super. 461, 324 A.2d 77 (N.J.Super.Ct.App. Div.1973), the court struck down a local ordinance which prohibited the operation of *any* retail business after 11 p.m. or before 6:30 a.m. Like defendants in the case at bar, the community defended the ordinance as a reasonable exercise of its police power to protect the "slumber of its residents by eliminating the noise, light and traffic that accompanies all-night retail operations," and also contended that it was unable to provide adequate police protection to all-night establishments. 300 A.2d at 197. Although the court rejected that justification, it did so on the basis that the ordi-

nance was overbroad, since it restricted "substantially every business without regard to its individual effect on the public health, safety, morals, or general welfare." 300 A.2d at 201. In contrast, the court pointed out that such ordinances had been upheld when the "specific businesses that had been regulated presented a clear danger to the public health or safety or both." 300 A.2d at 198. Among the examples of such "specific businesses" whose hours could legitimately be regulated under the police power, the court included drug stores, laundries in congested areas, and *street vendors*. 300 A.2d at 198–99. The challenged regulation in the case at bar not only lacks the general applicability that the *Fasino* court found fatal, but is directed toward an occupation that the *Fasino* court specifically recognized as properly subject to regulation.

### 2. *Sections 515.18(g), 524.1, and 524.2*

Plaintiff also challenges the limitations on the types of merchandise that may be sold (§ 515.18(g)) and the existence and amount of the bond (§§ 524.1 and 524.2) as violative of its members' rights to due process and equal protection. The restrictions on merchandise are more troubling than any of the other regulations challenged on equal protection or due process grounds. Although consumer protection appears to be part of the rationale for restricting the types of goods that street vendors may sell, Defendants' Exhibit J at 7, the primary purpose of barring sales of most types of manufactured items seems to be to protect shop owners from "unfair competition." Defendants' Exhibit J at 7. According to the Advisory Group on Street Vending, "Shop owners often view vendors as unfair competition because the vendor's low overhead expenses allows him/her to sell similar goods at significantly lower prices." *Id.* Rather than eliminate whole categories of goods, the Advisory Committee recommended that certain categories would be sold only in certain zones, in order to

ensur[e] that vending activity complements, rather than *unfairly competes,* with the goods offered by shop owners, while also allowing vendors to provide those same goods in areas where the public is not adequately served. In the Central Vending Zone, therefore, where stores and shops offer a wide array of general merchandise articles, this category of goods would be prohibited. However, in a neighborhood commercial area that does not offer a diversity of goods, sale of general merchandise should be allowed.

*Id.* at 8 (emphasis added). Defendants also note that "the City's commercial streets are taking on the quality of a bazaar, which may be appropriate at certain locations, but should not be commonplace." *Id.* at 7. While maintenance of a certain environmental quality or consumer protection are certainly permissible police power objectives, *see, e.g., City of New Orleans v. Dukes,* 427 U.S. 297, 304–05, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam); *Breard,* 341 U.S. at 640, 71 S.Ct. at 931, an avowed purpose of protecting one class of merchants—shop owners—at the expense of another class of merchants—street vendors—is a goal of highly doubtful legitimacy. As the New Jersey Supreme Court held in *Moyant v. Borough of Paramus,* albeit in the context of a commerce clause challenge,

> There can be no doubt that the business of soliciting and canvassing is a proper subject for regulation under the police power, as is peddling, and has been so considered for generations. The ... business ... opens the way for fraud, deceit and dishonest dealing by the unscrupulous, even though by only a minority of those engaged in it, with redress difficult or practically impossible.... *The power cannot, however, be exercised for 'a purpose to shield the local shopkeepers from lawful competition, and thus to serve private interests in contravention of common rights.'*

154 A.2d 9, 17–18 (N.J.1959) (citations omitted) (emphasis added).

Nevertheless, a number of courts *have* upheld restrictions on the types of goods, food, or merchandise that may be sold by street vendors against challenges brought under the due process or equal protection clauses. *See Dukes v. City of New Orleans,* 501 F.2d 706, 709 n. 1 (5th Cir.1974), *rev'd on other grounds,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding ordinance prohibiting pushcart sales of most items, such as soft drinks and novelties, but exempting certain others, such as hot dogs); *Hixon v. State,* 523 S.W.2d 711, 712–13 (Tex.Crim.App.1975) (upholding ordinance banning sidewalk sales of anything except flowers and ice cream); *City of Ravenna v. Ivec,* 202 N.E.2d 706, 707 (Ohio Ct.App.1963) (upholding conviction under ordinance requiring license to solicit of all persons except those selling products they produced themselves); *City of Chicago v. Rhine,* 363 Ill. 619, 2 N.E.2d 905, 907–08 (1936) (upholding ordinance banning street sales of anything except newspapers); *cf. City of New Orleans v. Dukes,* 427 U.S. 297, 303–05, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam) (upholding city's power to eliminate all vendors except those who had been in business eight or more years prior to passage of the ordinance).

The court agrees with the *Moyant* court's conclusion that the police power cannot be legitimately exercised to "reorder the balance," as counsel for defendants candidly put it, between street vendors and shopkeepers. The other interests advanced by the city for limiting the merchandise that may be sold by street vendors seem either overbroad or not closely related to the restrictions actually imposed. For example, while it may be in the interest of consumer protection to bar street sales of electronic devices or other items whose poor workmanship may be easily concealed, it seems doubtful that the District could justify the distinction between manufactured baskets, which are prohibited under section 515.18(g), and "hand-fashioned baskets and basketry" on that basis. Similarly, it is difficult to conceive of any aesthetic

concern that would be furthered by barring sales of machine-made leather goods, pottery, or quilts, but not their handmade counterparts.

Yet as pointed out earlier, the court may strike the regulations challenged as violative of the equal protection guaranteed under the fifth amendment only if they can be justified under no conceivable rationale. Clearly, it would have been within the authority of the District to ban *all* street sales of merchandise in order to protect consumers from sales of shoddy merchandise by itinerant street vendors, to reduce congestion on the city's sidewalks, or to prevent the city's business district from taking on a "bazaar atmosphere" or for other aesthetic reasons. At the same time, the city could have taken account of the fact that street vendors who make their own goods for sale would be left with few or no retailers who would be willing to purchase handmade goods for resale, and exempted those vendors from the general ban on sales of merchandise that could have otherwise been imposed. The fact that the city could have furthered its underlying purpose—that of eliminating merchandise sales on the city's streets—more completely does not warrant a conclusion that the method it chose is unconstitutional. *See Baldwin*, 436 U.S. at 390, 98 S.Ct. at 1864; *McGowan v. Maryland*, 366 U.S. 420, 425–27, 81 S.Ct. 1101, 1104–06, 6 L.Ed.2d 393 (1961). As the Court has repeatedly held over the past four decades, equal protection does not require that all evils of the same type be eradicated or none at all. *See, e.g., Railway Express Agency v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). Therefore, plaintiff's fifth amendment challenge to the merchandise restrictions in section 515.18(g) must be denied.

Plaintiff apparently does not argue that the difference in the size of the bond between residents and nonresidents violates

equal protection; rather, it contends that imposition of a bond on street vendors but not on store front vendors denies street vendors equal protection. The contention that any difference in the treatment of street vendors and shopkeepers violates vendors' equal protection rights is wholly without merit. If any one principle can be gleaned from the past several decades of equal protection jurisprudence, it is that the Constitution permits considerable flexibility in distinguishing among groups so long as those distinctions implicate neither a suspect classification nor a fundamental right.

Even if plaintiff's challenge to the bond requirement is considered in terms of the resident/nonresident distinction, the court's ruling that section 524.2(b) violates the commerce clause renders a further examination of this provision under the equal protection clause unnecessary.

### 3. *Section 508.3*

Finally, with regard to plaintiff's due process challenge to section 508.3, the court is unable to render an opinion as to the constitutional validity of that provision at this time. Under section 508.3, a vendor's license is subject to immediate seizure if he fails to make records of sales and receipts of purchases and expenses available for inspection. *See* §§ 508.1, 508.2, 508.3. Plaintiff contends that its members' rights to due process entitle them to a pre-revocation hearing. Defendants and *amici* respond that a section 508.3 seizure is not a final deprivation; rather, section 508.4 provides that any license seized must be returned as soon as the vendor submits the records and receipts required to be kept under section 508.

Although it is a truism that "*some* form of hearing" is required before an owner is finally deprived of a significant property interest,[10] both the timing and the nature

---

10. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) (emphasis in original); *see also Boddie v.*

of the required hearing depend on " 'appropriate accomodation of the competing interests involved.' "[11] Those competing interests include the importance of the private interests involved, the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interests involved. *Logan,* 455 U.S. at 434, 102 S.Ct. at 1157. Although it may be conceded that the right to engage in their livelihood is of significant importance to street vendors, *amici* contend that the deprivation is brief, since the license must be returned upon submission of the required records and receipts; little discretion is involved so that the likelihood of government error is minimal; and the government's interest in tax collection is substantial. *See Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 595–97, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931) ("[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate").

Since the procedures for return of a seized license are not specified by the regulations, it is impossible to determine the length of deprivation or the adequacy of the procedures for the ultimate determination by the Mayor under section 508.4 at this time. Similarly, although defendants argue that the likelihood of error is small since little discretion is involved, it is not clear that police officers will be able to make consistent determinations as to the "sufficiency" of the records of sales and receipts that must be made available under section 508.1. Indeed, the regulation itself does not specify for what purpose the records must "suffice."

■ In sum, the issue of the constitutional adequacy of the post-seizure hearing that the District will provide is not yet ripe for judicial determination. Since a pre-seizure hearing is not *necessarily* required by due process, and since the court could only guess as to how section 508 will ultimately be enforced, a ruling at this time would merely constitute an advisory opinion regarding what the law would be on a hypothetical state of facts. Because this issue has not yet ripened into a justiciable controversy through actual enforcement, therefore, the court is unable to render an opinion on the constitutional validity of section 508.3.

### C. Vagueness and ambiguity

Finally, plaintiff challenges three regulations on the ground that they are vague and ambiguous and thus violate its members' due process rights. Plaintiff claims that § 508.1, which requires vendors to make records of sales and receipts available for inspection "to any authorized representative of the District of Columbia Government" is unconstitutionally vague because it "could be interpreted" to mean that any official, agent, or servant of the District has the authority to demand a vendor's records and seize his license for nonproduction. Sections 510.3 and 510.4, which restrict street vendors to sidewalks which are at least eighteen feet wide and provide rules for measuring sidewalks to determine if they meet minimum width standards, are challenged as unconstitutionally vague on the ground that §§ 515.1 to 515.16, which specify the sections of the city where vending is permitted, do not list the sidewalks which are at least eighteen feet wide.

■ The Supreme Court has made it clear that a plaintiff bringing a pre-enforcement facial challenge to an ordinance on the ground that it is unconstitutionally vague bears a heavy burden. Assuming that the ordinance implicates no constitu-

---

*Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

**11.** *Logan,* 455 U.S. at 434, 102 S.Ct. at 1157 (quoting *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) ).

tionally protected conduct, such as freedom of speech, a court examining a facial vagueness challenge "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 497, 102 S.Ct. 1186, 1191, 1193, 71 L.Ed.2d 362 (1982). In evaluating a business regulation for facial vagueness, the court held, "the principal inquiry is whether the law affords a fair warning of what is proscribed. Moreover, this emphasis is almost inescapable in reviewing a pre-enforcement challenge to a law." *Id.* at 503, 102 S.Ct. at 1195–96.

 In evaluating the challenged regulations under these standards, it seems clear that neither the regulation on enforcement nor the regulations on location are void for vagueness. As *amici* point out, any potential problem with §§ 510.3 and 510.4 is cured by reading those provisions together with §§ 515.1 to 515.16, which specify the areas within which vending is permitted and particular areas where vending is barred. All a vendor need do is first determine whether vending is permitted in the area within which he intends to sell his wares, and then make sure that the particular sidewalk on which he intends to place his cart meets the minimum width requirements of section 510.3, as measured pursuant to section 510.4. It would be impossible for this court to declare that the language of §§ 510.3 and 510.4 is so vague and amorphous as to render it unconstitutional. *See Hoffman Estates, supra.* Although the particular measurements required by section 510.4 may pose some threat of inconsistent or arbitrary enforcement, the court is not free to assume that the District will not take further steps to particularize or standardize the methods used to measure minimum sidewalk widths should such problems arise. The city may well "adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the" regula-

tion. *See Hoffman Estates*, 455 U.S. at 504, 102 S.Ct. at 1196. " 'Although it is possible that specific future applications ... may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise.' " *Id.* (quoting *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 52, 86 S.Ct. 1254, 1264, 16 L.Ed.2d 336 (1966) ).

 Plaintiff's challenge to § 508.1 is only slightly more substantial. In evaluating a facial challenge to an ordinance, the court must consider any "limiting construction" that the city has offered. *Id.*, 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5. Here, defendants and *amici* point to section 501.12's implicit limitation on section 508.1's provision for inspection by "any authorized representative." Under section 501.12, "[t]he Metropolitan Police Department shall have primary responsibility for the enforcement of vending regulations, pursuant to Mayor's Order 82–186." Mayor's Order 82–186 provides that the Chief of Police is delegated the authority vested in the Mayor for District-wide enforcement of the regulations governing street vending. Defendant's Exhibit B. Therefore, defendants contend, the reference to "any authorized representative" in § 508.1 is vague neither on its face nor in any probable application. Because plaintiff has failed to demonstrate any credible threat of enforcement of § 508.1 by council persons, school board members, garbage collectors, or any of its other "wild[ ] hypotheticals," the facial vagueness challenge must fail. *See Electrolert Corp. v. Barry*, 737 F.2d 110, 114 (D.C.Cir.1984).

### III. *Conclusion*

The court's conclusion that most of the regulations at issue here withstand plaintiff's challenges under the commerce clause and fifth amendment guarantees of equal protection and due process should not be construed as an indication that the

**1448**

court is without sympathy for the individuals whose livelihood may be threatened by the actions of the District of Columbia. But as the Supreme Court pointed out in *Williamson v. Lee Optical,* the day is long gone when courts may "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." 348 U.S. 483, 488, 75 S.Ct. 461, 464 (1955). " 'For protection against abuses by legislatures,' " the Court emphasized, " 'the people must resort to the polls, not to the courts.' " *Id.,* 75 S.Ct. at 464–65 (quoting *Munn v. State of Illinois,* 4 Otto 113, 134, 94 U.S. 113, 134, 24 L.Ed. 77 (1876)).

Plaintiff's complaints are essentially political ones. As plaintiff's counsel himself has candidly admitted, the union's members are "[d]issatisfied with the results of the legislative process, [and] would now have the Court interject its judgment as to the propriety of the regulations." Opposition to *Amicus* at 1. Yet literally scores of cases decided since the New Deal have made it clear beyond any doubt that the judiciary is without authority to substitute its judgment for that of the legislature. Regardless of whether the court thinks the challenged regulations "unwise or improvident," all but section 524 are able to pass constitutional muster.